BAKER *v.* KELLER, ADMR.

[Cite as Baker v. Keller, 15 Ohio Misc. 215.]

(No. 37925—Decided April 12, 1968.)

Common Pleas Court of Marion County.

*Mr. Albert A. Yannon,* for plaintiffs.

*Mr. William B. Saxbe,* attorney general, and *Mr. Gerald Goldberg,* for defendant administrator.

*Mr. Edwin L. Mitchell* and *Messrs. Halberstein & Mitchell,* for defendant, The Osgood Company, Division Marion Power Shovel.

HITCHCOCK, J. (By assignment from Paulding County.) In this Workmen's Compensation appeal the jury, on Thursday, September 28, 1967, returned a nine member verdict at the conclusion of a trial that began on Monday

"that plaintiff is not entitled to participate in the Workmen's Compensation fund."

An alternate juror, who heard all the evidence, was dismissed before the jury began its deliberations. Judgment was entered upon the verdict October 13, 1967. Pursuant to provisions of Section 2321.19, Revised Code, the court extended the time for filing an application for a new trial.

Appellants' motion for a new trial alleging (1) irregularity in the proceedings of the jury, and (2) misconduct of the jury, filed December 20, 1967, was heard January 12, 1968. The evidence clearly established that one of the nine jurors signing the verdict has since 1949, on a number of occasions, suffered from "manic-depressive reaction, manic type" a mental illness. No evidence of misconduct was offered.

In this opinion this juror will be called "Mr. J." His physician for many years, a general practitioner, testified. From this testimony it appears that although Mr. J may for substantial periods of time appear to be normal, from time to time he definitely is not. He has often taken prescriptions for alleviation of his worst symptoms. These have chiefly been tranquilizing compounds prescribed by physicians of the Veterans Administration Hospital (V. A. H.) at Chillicothe. Mr. J has a patient status with V. A. H. such that any veterans facility will admit him for treatment upon report as a patient. Several years ago he bought a large amount of farm machinery which had to be returned because he was not responsible by reason of active manifestation of his psychotic condition.

On March 14, 1957, upon complaint of Mr. J's wife, made in case No. 21891 in the Probate Court, the Probate Judge of Marion County heard testimony from complainant, the sheriff, and Mr. J's physician, above mentioned. On the previous day, however, Mr. J. had been admitted to the V. A. H. which is located in Ross County. The Probate Judge who heard this mental illness complaint in 1957 testified that had Mr. J had the statutory notice and been in Marion County he would have then, on the testi-

mony, forthwith issued an order committing him for appropriate hospitalization. As it was, he recommended to Mrs. J that a proper complaint be lodged in the Probate Court of Ross County, followed by compliance with statutory requirements. This was never done and the Marion County Probate Judge was never told anything more about Mr. J. On this occasion Mr. J is reported to have exhibited maniacal tendencies following an episode of violence at his home. No other episode of violence is shown by the evidence.

V. A. H. records at Chillicothe show Mr. J to have been hospitalized there for treatment of his condition on at least six different occasions between 1957 and 1966. They also show a first admission on August 31, 1949, at Crile V. A. H. and two subsequent admissions there for the same chronic condition by 1956. All reports agree as to basic diagnosis with degree of impairment at the time of individual reports showing a range variously described as: mild, moderate, moderately severe, acute, severe, and in partial remission. The summary paragraph of the last report shows patient was admitted August 31, 1966, and discharged December 2, 1966, the concluding language of the summary paragraph reading: "On 12/1/66 the patient went AWOL and went to his home. We received a call stating he was at home, they would take care of him and he would not return to the hospital. He was not suicidal nor homocidal. No paranoid trends were elicited. He was not psychotic when released from the hospital. During his hospitalization, his medication consisted of Mellaril 200 mgm, tid; Artane 2 mgm, daily. He is competent. He can resume pre-hospital activity immediately. Stress: Undetermined. Predispostion: Undetermined. Impairment: Moderate." The date of this report is December 27, 1966.

The court asked the writer of this report what was intended to be conveyed by the words, "He is competent." The reply was that on the day mentioned in the report the patient had all his normal faculties and was well able to perform any job within his talents in a normal manner. That such condition would ordinarily continue until he

again might show psychotic behavior, which time might be almost any period of time—a day, week, month, several months, a year, or even longer period.

From the way counsel conducted the hearing the court must conclude that the whole trial was conducted and concluded with no member of counsel being aware of Mr. J's hospitalization for manic-depressive reaction, or the 1957 Probate Court inquiry. Just when and how, after the trial, it was discovered, was not disclosed. On the voir dire the record shows the following when Mr. J was called to replace a prospective juror who had been excused:

"Mr. Yannon: Mr. J I'm sure you have heard the questions that Mr. Goldberg and I have put to other jurors. I would like to say at the very outset that Mrs. Baker does not want any of the jurors to judge her case on the basis of sympathy. I make it very clear that we are here hoping to get justice for what we believe she is legally entitled to. We hope to convince you of that during the course of this trial. Mr. J we do not expect sympathy.

"Q. What is your employment? A. (———— — ————) (employer) truck driver work around the mill.

"Q. Mr. J is there any reason why you cannot sit as a fair and impartial juror and decide Mrs. Baker's case on the evidence that comes from the witness stand and the law given you by the judge? A. No.

"Q. Have you ever had a claim yourself? A. No.

"Q. Have you ever been called as a witness in any type of case where there would be Workmen's Compensation or other type of case? A. No, I haven't.''

Other jurors were selected, including an alternate, and all were sworn to well and truly try the issues presented to them. Plaintiffs exercised four peremptory challenges; the administrator two.

At the hearing on this motion for new trial plaintiffs failed to offer even a scintilla of evidence that during the trial, or within ten days before or after, Mr. J evidenced the slightest psychotic, abnormal, or irrational behavior.

They offered no testimony from his employer that his work as truck driver and elevator worker suffered during

this period of time. Nor did they offer any evidence that Mr. J had ever been challenged as unqualified to vote at any election or that he was presently so disqualified.

Decedent suffered a compensable back injury December 17, 1952, from which he never really recovered. He was on October 2, 1961, declared to be totally and permanently disabled. He died February 12, 1965, aged sixty-four years, weighing two hundred ninety-six pounds and being five feet eight inches tall. The issue was whether or not the injury aggravated a pre-existing cardio-vascular condition so as to hasten his death by a substantial period of time. An affirmative finding would entitle the widow and minor son claimants to receive death benefits under the Workmen's Compensation Act.

Two well schooled professors of medicine gave diametrically opposite opinions as to whether or not decedent's death was hastened by a substantial period of time.

The issue now before the court is whether or not appellants are entitled to a new trial. In considering this question the court has noticed that Ohio's Jury Code— Chapter 2313, Revised Code—clearly provides for annual jury lists in each county to be made up by the application of a key number (designated by the Common Pleas Court) to the entire list of electors as certified to the Clerk of the Common Pleas Court by the Board of Elections.

Concerning electors Article V, Ohio Constitution, in part provides:

"Section 1. Every citizen of the United States, of the age of twenty-one years, who shall have been a resident of the state one year next preceding the election, and of the county, township, or ward, in which he resides, such time as may be provided by law, shall have the qualifications of an elector, and be entitled to vote at all elections. * * *

"* * *

"Section 6. No idiot, or insane person, shall be entitled to the privileges of an elector."

Section 2313.41, Revised Code, provides for the setting aside of the whole jury array for certain causes upon

challenge made before the jury is empaneled and sworn but that "no indictment shall be quashed or verdict set aside for any such irregularity or misnomer if the jurors who formed the same possessed the requisite qualifications to act as jurors."

Section 2313.42, Revised Code, lists a number of causes for challenge of persons called as jurors but neither idiocy, insanity or other lack of qualifications of an elector appear among them. No doubt it would be incongruous in the extreme to include them because reliable answers could hardly be expected from idiots or insane persons and by reason of the fact that all jurors either are or should be privileged to be electors.

Our law permits public officers, clergymen, priests, physicians, attorneys at law, registered nurses, dentists, school teachers, nuns, members of a police force, firemen employed by a municipal authority, every person over seventy years of age, active volunteer fireman or those who have served five consecutive years as such; members of Ohio National Guard and Ohio Defense Corps to claim exemption from jury service. See Sections 2313.12, 2313.34, 737.26, 5919.20 and 5920.10, Revised Code. It does seem to this writer that the Legislature could make a definite contribution toward a better general understanding of freedom under law if courts could require that all of these exempted persons (except those over 70 years of age) serve on the jury for at least one civil and one criminal trial before becoming elegible to claim their exemption and particularly does this seem so in the case of school teachers.

Section 2321.17, Revised Code, defines a new trial and specifies the causes therefor. The facts here must be contemplated as coming within this statutory language:

"A new trial is a re-examination, in the same court, of the issues after a final order, judgment, or decree by the court.

"A * * * judgment * * * shall be vacated and a new trial granted by the trial court on the application of the party aggrieved, for any of the following causes affecting materially his substantial rights;

"(A) Irregularity in the proceedings of the * * * jury * ** by which he was prevented from having a fair trial. * * *,"
or appellants have no case.

Despite extensive search no Ohio cases were found where new trials were sought after return of the verdict on the ground that a juror was discovered to lack the constitutional qualifications of an elector because he was an "idiot, or insane person."

On the general issue of jury qualifications and new trials the case of *Eastman* v. *Wight* (1854), 4 Ohio St. 156, seems to be a landmark which has never been overruled and has often been followed. In this case a new trial was denied even though one of the jurors was not an elector because he had moved to Ohio from Indiana only six months previously. Otherwise said juror appeared to be a solid adult citizen who was not asked any questions concerning his status as an elector. At page 160 Judge Ranney states:

"It is certainly clear that all jurors must have the qualifications of electors; and if one not having such qualification is retained upon the panel, without the knowledge of the party or his counsel, and after reasonable diligence used to ascertain the fact when the jury is empaneled, a new trial should for that cause, be granted. But it is equally clear that the proper time to take the objection is at the empaneling of the jury; and it must be taken to have been waived, unless the party is able to show the court upon the hearing of the motion, that with the exercise of such diligence he could not have taken the exception at the proper time. This is indispensable to prevent constant mistrials, and to protect the rights of the adverse party; otherwise the party afterwards taking the exception might lie by and take the chances of a verdict in his favor, and if given adversely, be entitled to a new trial as a matter of course. We have, therefore, settled, that to lay a proper foundation for a new trial, for such cause, it should be shown to the court that the disqualification of the juror was unknown to the party *and his counsel* at the time the

jury was empaneled, and that reasonable diligence was used before the jury was sworn, by inquiry of the juror or otherwise, to ascertain whether such objection to his sitting existed. * * *

"The necessity of showing the counsel ignorant of the objection is most apparent. In most causes, he is better acquainted with the persons appearing in the jury box, than his client can be. He acts for the client as his authorized agent, and consequently, binds the client by his acts in the management of the cause. In this, as in other cases of agency, his negligence is the negligence of the client, and his knowledge, the knowledge of the client. If, therefore, he knows of the disqualification, at the time the jury is empaneled, it is but right and justice to the other party, that the objection should be then taken. Whether he had such knowledge or not, can only be known to the court hearing the motion, when it is made to appear by affidavit; and it did not appear in the present case. The objection to the juror in this case was of the slightest imaginable consequence, as it is not to be presumed that his judgment or honesty would have been materially improved by residing six months longer in the state. * * *"

At the trial, defendant and his counsel, having had opportunity to question the newly arrived juror touching his residence and having failed to do so, were deemed to have waived objection to him on the one ground discovered after verdict to be existing in fact which would have established a firm foundation for a challenge for cause—*i. e.,* that he was not a duly qualified elector by reason of insufficient length of residence. Had this juror been carefully questioned and had he told the truth and been unchallenged, surely a like result would be reached. But had he lied and said he had been resident in Ohio for one year and six months, a fabrication unknown to counsel or parties and not readily ascertainable from others present at such time and place it seems clear that, on principle, a new trial would be granted, because little reliance can be placed on a dishonest juror.

In paragraph 2 of the syllabus by the court the rule was stated to be:

"All jurors must have the qualifications of electors; and if one, not having such qualifications, is retained upon the panel, without the knowledge of the party or his counsel, and after reasonable diligence used to ascertain the fact when the jury is empaneled, a new trial should be granted."

From this we may conclude that failure to inquire concerning status as an elector is insufficient to establish proof of the exercise of reasonable diligence.

A review of published Ohio reports shows new trials to have been denied over the years in these fact situations (which are listed chronologically):

1853. Same person sat as juror in both first and second trials of same cause tried by the same counsel.

1854. *Eastman* v. *Wight, supra.*

1872. Attorney knew member of jury was an elector from an adjoining county but remained silent. After verdict went against client he revealed fact and objected.

1874. The venire was asked, "Will all those who have served as talesmen jurors in the past twelve months please stand?" At least two who had done so both remained seated and otherwise did not reveal facts. (This is only case found where dishonesty on voir dire was condoned.)

1876. Juror appeared to be 21 years of age but was not. No one questioned him about his age.

1884. Sheriff couldn't find venireman named John F. Hetzler but found John C. Hetzler and reported him as being John F. In court John C. appeared and answered questions truthfully. He was asked to step aside and did.

1893. John Brown was summoned as juror. His son Michael appeared and answered to name John Brown. He had told sheriff he was sometimes called John Brown but his real name was Michael. These facts were unknown to counsel and juror was asked no questions in this respect. In every other way he was a properly qualified juror.

1933. Jurors called were not summoned pursuant to

statutory provisions. No complaint was made in this respect, or because of lack of essential qualifications, until after verdict.

1940. Jurors who had already served a full three weeks were summoned to sit because an unusual trial had depleted regular jury panel. Counsel asked no questions re prior service and did not learn the facts until after adverse verdict.

1946. The bailiff was directed to summon talesmen because of a shortage of regular jurors. He called upon three who were visitors at the court house without consent of both parties as required by Section 2313.39, Revised Code (then Section 11419-48, General Code). The talesmen so improperly chosen sat without either party knowing they had been improperly chosen or consenting thereto, and no inquiry as to their manner of selection was made. (A dissent insisted that due diligence did not require counsel to inquire if the selection statute had been broken. That the required consent was never obtained and consequently there could be no waiver by necessary implication.)

1965. Juror disclosed 1957 auto accident but not two later ones well known to attorney who made no further inquiry. A clear case of waiver as explained in *Eastman* v. *Wight, supra.*

The same review shows new trials to have been granted in these fact situations (also listed chronologically):

1905. Two jurors who had acted as such for a number of trials during the preceding twelve months were asked, "Have you served as a juror within a year?" and disclosed only service performed the preceding week and concealed other service of much greater extent.

1929. Two jurors, both related to plaintiff by affinity, one in seventh degree, other in eighth, and who commonly attended the same family reunion in which plaintiff was active and prominent, remained silent when asked if they were related to plaintiff by blood or affinity.

1935. On voir dire, jury panelist who had suffered a severe neck injury in auto accident, remained silent when asked if he had ever suffered personal injury.

1936. Two jurors on same jury, on voir dire, were

untruthful in declining to reveal their own personal injury claims, even though Court of Appeals, on the record, doubted that any jury would reach a verdict substantially different from the one returned.

Examination of the record on voir dire in this case, and the proof at the hearing, discloses no definite proof of untruthfulness on the part of Mr. J. As he has been for some time a recipient of benefits of the Veterans Administration which are rarely, if ever, obtained without making a proper claim therefor our suspicions are aroused by his answer, ''No,'' to the question, ''Have you ever had a claim yourself?'' In light of the circumstances, however, I find Mr. J could have properly and logically construed the question to refer to a ''Workmen's Compensation Claim.'' The other question put asked him if he had ever been called as a witness. There is nothing in this record proving Mr. J to have been untruthful on voir dire or creating any presumption that he was. Certainly neither he nor any other member of the panel was asked if they had been hospitalized for mental or emotional illness.

This court finds itself in complete agreement with all the decisions in the fact situations related above either denying or granting a new trial except the one wherein definite untruthfulness on the part of a juror was condoned[1] and the one wherein three talesmen were found among

---

[1] *Wilder* v. *State* (1874), 25 Ohio St. 555.

Entire panel heard judge when he asked that every member who had served as a juror in any court of record in the county during the preceding twelve months to stand. A member of the panel who had so served remained sitting and eventually served on the jury which convicted appellant. Appellant's counsel did not know juror had so served and did not repeat the judge's question on *voir dire*. The *per curiam* opinion indicates appellant's counsel exercised no diligence by not thoroughly interrogating the prospective juror on *voir dire*. Personally, I am unable to burden counsel with some rule the equivalent of presuming that most jury panelists do not give true answers to questions of the court touching their qualifications to serve. Other cases in which this case was cited have not dealt with the essential dishonesty problem or have indicated that it must be shown that the dishonest juror's conduct positively prejudiced appellant. For me the best rule is that prejudice results when jury panelists, through their own dishonesty, obtain a position as judge of the facts.

court house visitors.[2] It appears that in this latter case the bailiff seated these talesmen (otherwise well qualified electors) with the regular jury panel unknown to either the court or counsel and they were called for jury service without the slightest indication they were not from the regular panel. In any common sense evaluation of the situation, I cannot feel that there was any actual consent or any knowledge from which waiver may fairly be inferred. It does, however, appear that counsel could have learned the true status of these talesmen because the majority opinion recites: "Counsel for the appellant had available for use and comparison the list of regular jurors. They had the opportunity to explore on the voir dire every phase of their qualifications." The lesson, I suppose, is that counsel should carefully check their jury lists and if a panelist appears whose name is not on the regular list, counsel should determine why.

From the foregoing it appears that if one or more jurors are untruthful in answering questions on voir dire examination, an irregularity occurs which prevents parties from having a fair trial. All are entitled to honest jurors. It also appears that lacking the qualifications of an elector by reason of lack of age or residence which might have been discovered by interrogation is not such an irregularity if the actual participating juror represents a sound mind in a sound body. But what if the actual participating juror be known to periodically suffer mental illness of such severity as to require hospitalization about once every two years over a period of nearly twenty years?

Robert H. Felix, M. D.,[3] and Morton H. Hunt,[4] writing in Family Medical Guide, Meredith Press, New York-Des Moines, 1966, 3rd printing, presenting a "median viewpoint" do say:

---

[2] *State, ex rel. LeGere* v. *Carros* (1946), 80 Ohio App. 65.

[3] Dean, St. Louis University School of Medicine; past Director National Institute of Mental Health; Recipient Rockefeller Public Service award for distinguished service in the field of science.

[4] Distinguished writer in fields of mental health; Recipient, Family Service Association Award, 1963; Author, "Mental Hospital" and "The Talking Cure."

"* * * Using various surveys, the Joint Commission on Mental Illness and Health recently estimated that nearly 20,000,000 Americans (one out of every ten persons) suffer from either a minor or major form of psychological difficulty. The larger part of these, to be sure, are minor and non-crippling, all but 717,000 of the 20,000,000 affected persons are able to remain outside mental hospitals, in the body of society. * * *" page 681.

And at page 685:

"5. *Psychoses.* The illnesses thus far described may, from time to time, require hospitalization, but the great majority of people suffering from them are able to remain in the world and to get along, even though imperfectly. But with the *psychoses,* we are in the realm of serious mental illness which more frequently is so disabling, or so disturbing to the patient or society, as to require treatment in a hospital for a period of time.

"A psychotic may, for instance, be so depressed as to refuse food altogether or to attempt suicide. He may be so confused that he fails to recognize relatives and friends, and is not even sure of his own identity. He may hear voices, see apparitions, imagine himself in contact with God, and actually act upon what his 'voices' tell him to do. He may be prey to uncontrollable spasms of laughter, senseless rages, or total apathy.

"As a result of such symptoms, about half of all psychotic persons in this country, or about half a million people, are currently patients in state, federal, and private mental institutions. Probably another half million psychotics are borderline cases, and get along on their own or are cared for at home by their families.

"Although a psychosis is an illness of the mind, it can be produced either by psychological or physical causes.

"In a little over half of all hospitalized psychotics, the mental illness seems of primarily psychological causes— *i. e.,* internal emotional tensions and conflicts, acted upon and aggravated by external pressures such as deprivation or tragedy. They suffer from diseases whose names have become familiar to almost everyone—*schizophrenia, involu-*

*tional psychosis, manic-depressive psychosis,* and others.

"The other half of the hospitalized psychotics are victims of 'organic psychoses,' or serious mental illnesses which have primarily physical causes. Brain tumors, hardening of the brain arteries due to age, and damage to brain tissues from alcoholism, drug addiction, or injuries, all cause serious mental malfunctioning with symptoms which are often rather similar to those of the functional (psychologically caused) psychoses. Physical and mental tests enable psychiatrists to distinguish between the two and prescribe treatment accordingly."

In discussing treatments these authors say at page 687:

"Even though the data indicate that many untreated nervous conditions get better by themselves, other data indicate that many of them grow worse and become catastrophic. When there is therapeutic intervention, however, about two-thirds of persons treated by psychological methods show distinct improvement or cure.

"The clearest evidence in favor of active treatment comes from mental hospitals. Several generations ago, when psychotics were locked up in hospitals and given next to no therapy, a great many of them grew worse and worse, becoming virtual vegetables. Today, with combined somatic and psychological therapies being given them as soon as they arrive, four-fifths of newly admitted patients at the better mental hospitals can be released within half a year as cured or at least improved enough to get along in society.

"Making such a crucial decision, except where the problem is very obviously quite minor, requires the diagnostic help of a highly trained professional—usually a psychiatrist, although the highly qualified psychologists and social workers on the staffs of mental health clinics and family service agencies can do quite competent preliminary diagnostic work where psysical ailments are not involved in the emotional or mental disease."

And at page 692 under *Sources of help* they conclude:

"What Shakespeare wrote of death could as well be written of psychiatric treatment, as far as many people

are concerned; it is fear that makes us 'rather bear those ills we have, Than fly to other we know not of.' But the time has come to lay aside that fear. The majority of people treated by any legitimate psychological or somatic therapy, for any kind of emotional or mental disorder, now are benefited or completely cured—the sooner the treatment being started, the better the chances for swift and complete recovery.''

From my review of legal literature going back to 1800 it seems apparent that the common definition of the word ''idiot,'' as understood in 1851 when our present Constitution was in the main adopted, meant that it refers to a person who has been without understanding from his nativity, and whom the law, therefore, presumes never likely to attain any. I am unable to find anything indicating any real change in this definition to this date. Our Mr. J is clearly not an idiot.

The words ''insane person,'' however, most commonly then as well as now, refer to a person who has suffered such a deprivation of reason that he is no longer capable of understanding and acting with discretion and judgment in the ordinary affairs of life. It seems quite apparent that some persons who once had normal reason and sense faculties become permanently insane. Others lose their normal perception and reason for relatively short periods of time such as day, a week, or a month or two, and then regain their normal condition for either their entire life or for some lesser indeterminate period. During these lucid intervals such persons commonly exercise every characteristic of normality associated with all those persons who have never, even for a short period, been deprived of their normal reasoning faculties.

*In re South Charleston Election Contest* (1905), 3 O. N. P. (N. S.) 373, 50 W. L. B. 173, concerned an election wherein the result was certified to be:

''For the sale of intoxicating liquors as a beverage, 166 votes, against the sale of intoxicating liquors as a beverage, 167 votes; three ballots not marked, and two ballots marked incorrectly.''

The proof showed that a person voted at the election whose mental condition at the time was such that a court would experience no hesitancy in committing him to an insane asylum or in appointing a guardian for him were proper application made.

Concerning him the court at page 389 said:

"He had the ordinary intellect of a child as he grew, until he reached the age of seven years, when he was stricken by a sun stroke, the immediate result of which was paralysis, with all conditions attendant upon complete imbecility. All who have testified concerning him admit that he is weak-minded and several of the physicians testified that had his condition, as it now exists, extended continuously back to the time of his birth, he would be regarded as an idiot. Others say he is an imbecile. He displayed in his examination considerable shrewdness in some of his answers; but showed an absolute lack of knowledge of the proper way to mark his ballot, although he persisted in the statement that he voted 'dry' at the election."

Whereupon, determining that the vote of this person was cast illegally by one not entitled to the privileges of an elector and being unable to determine from the evidence how it was cast, the court held it must be deducted from the proposition being contested, which left the result 166 in favor of, and 166 against the sale of intoxicating liquors and the election held to be null and void and set aside.

Had the evidence concerning Mr. J been the approximate equivalent of that in the foregoing cases I would, I feel, grant plaintiffs a new trial. Or even if there were any evidence of real abnormality on the part of Mr. J during, or very near to, the time of the trial. Nor would I declare that failure to conduct a thorough private investigation of such juror which would have revealed his mental health history to be a failure to exercise reasonable diligence to learn his qualifications to act as juror. Such a rule would seem to me to place too great a practical burden on counsel and be inimical to the general purpose of providing litigants with competent, fair and impartial juries. Ordinary questioning by counsel will surely disclose most idiots and

insane persons who, through some mischance or inadvertence, appear on jury panels and lead to their exclusion from jury duty. In this case there is no evidence that at the time of the trial Mr. J did not possess the qualifications of an elector as prescribed by the Constitution of Ohio.

To me, the trial was fairly conducted and the verdict one which was certainly not contrary to the manifest weight of the evidence. Permitting the verdict to stand as it is, I believe, does a full measure of justice to all parties and to the juror who is the subject of this inquiry.

This decision compliments and respects our mental illness statutes which have been largely rewritten and modernized during the ten years last past. These statutes comprehensively provide for those who are surely within the contemplation of the constitutional language ''idiot, or insane person.'' See the Revised Code of Ohio: Chapter 5121 Welfare Institutions—Generally; Chapter 5122 Hospitalization of Mentally Ill; Chapter 5123 Hospitals for Feeble-Minded and Insane; Chapter 5125 Commitment of Offenders: Hospitalization of Mentally Retarded; and Chapter 5905 Veterans' Guardianship Law.

Section 5122.01 (A), Revised Code, defines the ''mentally ill individual.'' Section 5122.02, Revised Code, provides for the admission of voluntary patients and the first sentence of the last paragraph of this section reads: ''The head of the public hospital shall discharge any voluntary patient who has recovered or whose hospitalization he determines to be no longer advisable.'' Section 5122.05, Revised Code, outlines the procedures for the admission of involuntary patients and specifies the sections providing for (1) standard nonjudicial procedure; (2) emergency procedure with medical certificate; (3) emergency procedure without medical certification; and (4) judicial procedure.

How Mr. J was admitted to the V. A. H. is not entirely clear although if his admission was not voluntary, it was surely nonjudicial. Section 5122.03 (A), Revised Code, provides that a voluntary patient who requests his release in writing shall be released forthwith unless the head of

the hospital by affidavit informs the Probate Court that "in his opinion the patient is mentally ill and the release of the patient would be unsafe or detrimental for the patient or others."

Despite Mr. J's considerable hospitalization he has never been adjudicated incompetent by the probate or any other court, or had a guardian appointed for him. The first sentence of Section 5905.19, Revised Code, Termination of guardianship, reads:

"In addition to any other sections of the Revised Code relating to judicial restoration and discharge of a guardian, a certificate by the veterans' administration showing that a minor ward has attained majority, or that an incompetent ward has been rated competent by the veterans' administration upon examination in accordance with law shall be prima facie evidence that the ward has attained majority or has recovered his competency."

No evidence has been introduced to rebut Mr. J's V. A. H. report which declares him competent. Other states have denied new trials in somewhat similar circumstances.⁵

Consequently, the motion for a new trial will be overruled. Counsel may prepare an appropriate journal entry.

---

⁵See *State* v. *Bucy* (1937), 104 Mont. 416, 66 P. 2d 1049, where defendant was convicted by a jury on November 28, 1936. Then defendant learned a juror had on July 21, 1927, been declared insane, was committed to the asylum, and had never been restored by court order or statutory certificate. Two physicians examined this juror later in the same day the verdict was returned. In their opinion he was then quite competent mentally and normal in conduct. A layman well acquained with him testified he considered him normal and knew he was a competent and trustworthy farm hand. The juror himself was examined and he stated he was committed to the asylum on July 21, 1927, by reason of a nervous breakdown, and was released the following September when officials pronounced him cured. That ever since he had worked as a farm laborer and had been a ranch foreman since early 1934.

A Montana statute provided that a juror is not competent to act as such who is not in possession of his natural faculties. The court said that it is widely held that an adjudication of insanity establishes a rebuttable presumption, not a conclusive one, of continuing insanity. So the question becomes one of fact as to whether the juror was competent at the time of the trial. As the trial court, with rea-

son, found the juror was then competent, denial of a new trial was affirmed.

And *Iverson* v. *Prudential Ins. Co.* (1941), 126 N. J. L. 280, 19 A. 2d 214. A jury returned a verdict on May 8, 1940. A member of this jury was first noticed to act strangely on May 14, 1940. On May 17, 1940, he was admitted to the New Jersey State Hospital for the Insane. An alienist testified that he was insane although the court said this testimony was, on cross-examination, greatly de-emphasized. The Court of Errors and Appeals affirmed the trial judge who concluded that "it was not shown that the juror was so incompetent at the trial as not to be able to comprehend the nature and quality of his acts. At the trial he gave all indications of normal poise and mentality."

In the opinion of this court the trial court here would have been equally upheld had he granted a new trial for the reason that outward manifestations of abnormality are often preceded by some period of stress to which the particular person is sensitive and during such periods the risk is great that his judgment is far from normal. From what I can learn such a risk is probably greater than in those cases wherein the individual juror had been restored to competency an equal number of days prior to trial.

Accord, *Eastman Kodak Stores* v. *Summers* (Mo.) (1964), 377 S. W. 2d 476 in case where a verdict was returned January 30, 1963. On February 16, 1963, the trial court learned a juror had been adjudicated as of unsound mind in 1924 and had never judicially been restored to competency. At the hearing evidence showed this juror had for some years operated a farm, bought and sold livestock, transacted other farm business and appeared to be normal. A new trial was denied,