TANTON *v.* ZUBKOWICZ.

[Cite as Tanton v. Zubkowicz (1971), 32 Ohio Misc. 108.]

(No. 835335—Decided November 21, 1971.)

Common Pleas Court of Cuyahoga County.

*Mr. D'Arnold Davis* and *Mr. Samuel Handelman,* for plaintiff.
*Mr. Joseph J. Naegele* and *Mr. Edward T. Clarke,* for defendant.

HITCHCOCK, J. (By assignment from Paulding County.) Plaintiff's motion for a new trial is granted despite a unanimous verdict for the defendant in an action growing out of a 1965 automobile accident, the fact that there are two other pending cases resting upon the same facts, and that the court has strong feeling that all three cases should be swiftly terminated. The reasons why are set forth in the opinion which follows:

Ohio Civil Rule 59, New Trial, now provides in part:

"(A) *Grounds.* A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

"* * *

"(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

"* * *

"In addition to the above grounds, a new trial may also

be granted in the sound discretion of the court for good cause shown.

"When a new trial is granted, the court shall specify in writing the grounds upon which such new trial is granted. "* * * *."

Uncontroverted evidence shows that on June 25, 1965, in dry weather, Archie Tanton, plaintiff's ward then competent, a domestic maid of 61, was driving her 1964 Chevrolet coach east on four-lane Harvard Avenue at about 11:30 p. m. in a level area in Cleveland where twenty-five miles per hour was the prima facie lawful speed, and a speed exceeding the same was prima facie unlawful. As she approached the point where two-lane East 176th Street intersects Harvard to the north she signalled and made a left turn. Her Chevrolet was proceeding slowly and when the front wheels were perhaps just over the north boundary line of Harvard and into East 176th it was struck by defendant's westbound 1964 Pontiac coach in the north lane of Harvard. Mrs. Tanton, her car, and two small grandaughter passengers were thrown 85 feet west of the probable point of impact on a line about 20°-30° to the north. Her car came to rest against a service station gas pump. Defendant's Pontiac made a reverse bounce and came to rest over the north curb of Harvard some fifteen—twenty feet east of the probable point of impact. Defendant, a man of twenty-two at the time, was accompanied by two other young men, one twenty and the other twenty-four years of age. Mrs. Tanton and one granddaughter suffered physical injuries, as did defendant's passengers. The other granddaughter was killed and defendant "shook up." Both autos were badly damaged.

At the time of the trial Mrs. Tanton was not competent to testify and defendant was not permitted to testify by reason of the "dead man statute" which applies to guardians as well as executors and administrators.

The police found fifty-eight feet of solid skid marks on the dry asphalt pavement running east and west in the curb lane of Harvard. These skid marks ended perhaps twenty feet east of the probable point of impact and ran

to the east thereof a distance of fifty-eight feet. The police who investigated this accident arrived on the scene at 12:20 a. m., June 26, 1965. The police investigator was of the opinion that when he arrived at the scene neither car had been moved subsequent to coming to rest after the collision; also, that the skidmarks were made by defendant's Pontiac but made no mention whatever of their significance, or the significance of the location of the vehicles following their collision in terms of speed and force necessary to produce such result.

Why this cause was so long in coming to trial is not known. It was only the exercise of positive direction by Chief Justice John V. Corrigan and this court that resulted in this trial beginning on July 15 and ending on July 21, 1971. It also appears that until the Chief Justice first directed in March 1971, that this cause be tried or dismissed on the first of three consecutive days certain that no competent investigation of the accident was made by anyone for plaintiff and the court must suspect the poverty of the original plaintiff (now plaintiff's ward) as the chief reason, not to mention that she remained in the hospital from June 26, 1965 to October 8, 1965. At the eleventh hour the case was investigated preparatory to trial and witnesses —including some discovered for the first time—were interviewed. Although plaintiff did present a prima facie case, the crucial evidence offered to sustain the fact pattern plaintiff attempted to prove consisted, in the opinion of the court. of incredible testimony.

The evidence of speed as reflected by the skid marks and the obvious propulsion through space of the involved automobiles appears not to have been appreciated by either the police or plaintiff's counsel. For this court, it is extremely difficult to believe that the intelligence at defendant's command did not really appreciate that the physical facts established did not strongly indicate that defendant was driving at a speed which could hardly be less than twice the prima facie lawful speed of twenty-five miles per hour.

Although one of defendant's passengers was a physics teacher who testified for the defense, he was not asked by

anyone what explanation of the known facts would necessarily result if examined in the light of the laws and principles of physics. Practically all discussion by counsel in respect to speed was in connection with the testimony of persons having no qualification to judge speed in precise terms of miles per hour, even though one member of the jury was an electrical engineer.

This court is authorized to and does take judicial notice of the laws of physics;[1] of the recognized multi-volume legal text, "Proof of Facts," Bancroft-Whitney Company, San Francisco, California—The Lawyers Co-operative Publishing Company, Rochester, New York, 1961, annually supplemented;[2] and the publication of The National Auto Dealers Association, 2000 K Street N. W., Washington, D. C. 20006, entitled "N. A. D. A. Official Used Car Guide" which has been issued monthly to automobile dealers throughout the United States since 1930. It provides current data regarding new and used automobiles and it is widely relied upon by said dealers and their employees as truly indicative of the data therein contained.

A quick reference to Vol. 10, Proof of Facts, at Figure 9 of the Appendix entitled "Basic Skidmark—Speed Calculator" indicates that *had* defendant's automobile come to a stop at the west end of its skidmarks he might not even have entered into the Harvard East 176th intersection and would have been traveling at a minimum speed of thirty-one miles per hour when he perceived something causing him to apply his brakes. Still his auto (with a shipping weight of 3695 pounds when new and with three passengers probably weighing over four hundred pounds) traveled some ten to twenty feet further in an essentially straight line to crash into Mrs. Tanton's nearly stationary auto (with a shipping weight of 3230 pounds when new and carrying herself and two children weighing probably near 300 pounds) with *such force* as to *propel* her auto and passengers over asphalt and concrete walks *a distance of*

[1]*Surman* v. *Ohio & Pennsylvania Oil Co.* (1962), 116 Ohio App. 453, 89 Ohio Law Abs. 33.

[2]21 Ohio Jurisprudence 2d, Evidence, Sections 63, 64.

*eighty-five feet.* Basic physics calculations indicate defendant must have been proceeding at a speed of between forty and forty-five miles per hour at the moment of impact.

Applying a thirty-one mile per hour skidmark speed and a forty mile per hour point of impact speed to Proof of Facts, Vol. 10, Appendix Figure 10, "Nomograph for Determining Initial Speed from Skidmark Speed and Point-of-Impact Speed" to arrive at the meaning of these combined speeds indicates defendant must have been proceeding at a speed of just over fifty-one miles per hour when observing something causing him to apply his brakes.

This court can only conclude that no proper presentation of the facts in evidence—and their significance—was ever made to the jury; and that were such presentation properly made there is great likelihood that defendant would be shown to be the sole proximate cause of the injuries suffered by Mrs. Tanton because her duty to yield the right-of-way to persons in defendant's position at the place she turned left is conditioned upon such person proceeding "lawfully" on the street.

Optical science tells us that the accuracy of one's depth perception is made more difficult when many reference points visible in the daytime are obscured at night. This seems to be one of the basic reasons why Ohio's night-time prima facie lawful speed is ten miles per hour less than for daytime driving. See Vol. 1, pp. 1050-1073, W. Stewart Duke—Elder, "Textbook of Ophthalmology," C. V. Mosby Co., St. Louis, 1934.

The jury never having had the opportunity of intelligently weighing the evidence presented, this court declines to grant a new trial on the ground that the judgment is not sustained by the weight of the evidence. It does find that the significance of uncontroverted facts in evidence, in light of the laws and principles of physics were never appreciated by plaintiff's counsel or properly presented to the jury for evaluation in a context where that evaluation seems to have no confusing factor, and does not depend primarily upon credibility, such that plaintiff has not had a fair trial.

Defendant, it seems to this court, in respect to conduct indicated by evidence of so reliable a character, is today not entitled to any privilege shielding him from a fair evaluation of such proof any more than he has to believe that the world is flat as it seems and not spherical as it has been proven to be. Of course, if the evidence had shown the presence of rain, snow, ice or other condition as a definite confusion causing factor, a different result might be reached. See *Baker* v. *Keller* (1968), 15 Ohio Misc. 215, in respect to a situation where experts disagreed as to the most probable inference to be drawn from the same admitted medical facts and a new trial was denied.

A judgment entry granting plaintiff a new trial is filed herewith.

*Motion for new trial granted.*